# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 28, 2014

## RONALD EUGENE BREWER, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hawkins County**
**No. 12CR032     John F. Dugger, Jr., Judge**

_____

**No. E2013-01537-CCA-R3-PC - Filed March 6, 2014**

_____

Ronald Eugene Brewer, Jr., ("the Petitioner") was convicted of first degree premeditated murder, first degree felony murder, and attempted first degree murder. The trial court sentenced the Petitioner to life imprisonment without the possibility of parole for each first degree murder conviction and a concurrent twenty-five-year sentence for the attempted first degree murder conviction. The trial court then merged the felony murder conviction with the premeditated murder conviction. On direct appeal, this Court affirmed the Petitioner's convictions. See State v. Ronald Eugene Brewer, Jr., No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *22 (Tenn. Crim. App. July 14, 2011), perm. app. denied (Tenn. Sept. 21, 2011). The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that he was denied due process and the effective assistance of counsel at trial. Upon our thorough review of the record and the applicable law, we affirm the post-conviction court's decision denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Aaron J. Chapman, Morristown, Tennessee, for the appellant, Ronald Eugene Brewer, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; C. Berkeley Bell, District Attorney General; and Alex Pearson and Kevin Keeton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

Around 8:30 p.m. on December 9, 2008, Jackson Blue Sellers, the eighteen-year-old victim, was talking to friends in the parking lot of the Rogersville Wal-Mart when he was shot and killed by the nineteen-year-old Defendant. When the Defendant fired his rifle into the parking lot from an abandoned car wash perched upon an adjacent hill, the victim was not his intended target. The Defendant claimed that, when he fired the shot, he was trying to wound, but not kill, Josh Hinkle.

. . . .

The State presented the testimony of multiple witnesses who were in the Wal-Mart parking lot at the time the victim was shot. Jason Greene recalled that he and the victim were engaged in a conversation with some friends. Mr. Greene turned around toward his vehicle to get a cigarette and, at that time, he heard what he thought was a firecracker. When he came back to where the victim was standing, he saw the victim holding his throat. Mr. Greene stated that blood started to come out of the victim's mouth and that the victim then fell to the ground.

Meghan Brooks testified that, during the evening of December 9, 2008, she went to Wal-Mart with her friend Samantha Allen. By the time they arrived, some of their friends had already started gathering in the parking lot. She recalled that Jordan Hinkle, Josh Hinkle, Jason Morelock, Cody Harmon, Travis Goins, and the Defendant were all there. She said that Mr. Goins yelled for her to come over to where he and the Defendant were, however, she did not go over right away. The two men then drove over to Ms. Brooks and spoke to her. Before they pulled off, the Defendant told Ms. Brooks to "make sure none of these boys leave the parking lot" and "that he was serious." Ms. Brooks said that Mr. Goins and the Defendant were in a black Nissan Maxima and that she saw them leave the parking lot and go toward the highway.

Ms. Brooks saw the two men return, about ten to fifteen minutes later, and park in the parking lot "[f]or a little bit." Then, she witnessed them leave through Wal-Mart's back entrance. After she saw them leave, she said that she

and the other people there "[j]ust sat around and socialized." About five minutes after the Defendant and Mr. Goins left the parking lot, however, Ms. Brooks heard a "pop." She testified that the victim began bleeding from his mouth and then fell to the ground.

Ms. Brooks said she believed that Josh Hinkle and Jordan Hinkle were affiliated with a gang called the Bloods, whose color was red, and that the Defendant and Mr. Goins were affiliated with a gang called the Crips, whose color was blue.

Samantha Allen testified that, on the night of the shooting, she saw the Defendant and Mr. Goins driving a black Nissan Maxima. She recalled that they were in the Wal-Mart parking lot for a little while, but then she saw them leave. Later, she heard what she thought was a firecracker and then she saw a black Maxima "flying out of the car wash." Ms. Allen also testified that Josh Hinkle and Jordan Hinkle were "wanna-be" gang members of the Bloods.

Wesley Lyles testified that he was friends with the victim and, on the night of December 9, 2008, the two men talked and drove around town together. They ended up at Wal-Mart, where they spoke to friends in the parking lot. Mr. Lyles described what happened next as follows:

> We were standing there and me and him were talking, and then he was going to get with Danielle, and I think they was going to go get a bite to eat or something like that, and he was going to come back and holler at me in a little bit, and we were standing there talking and we just – We heard something that sounded like a firecracker went off and then he just – He was – He staggered around there for a minute and he was rubbing his face and he kept asking what happened, and I didn't know what happened. He was just standing around and kept rubbing his face and he just collapsed right there.

Mr. Lyles said that, as his friend was lying on the ground, he put his hand behind the victim's head and blood drained all over it.

After Mr. Lyles heard the noise that sounded like a firecracker, he heard a vehicle "squealing out" and said, "It sounded like it was up on the hill, but I didn't – All I seen was the tail lights." He then clarified that by "up on the hill," he meant the car wash at an old gas station.

-3-

Charles Hoke said that, on the night of the shooting, he was talking to friends in the Wal-Mart parking lot. He recalled, "After I was there for a while, I looked up on the hill and I seen a car go by real slow and two guys looking down." He said that both of the people he saw in the car on the hill by the car wash were white with black hair. Then, Mr. Hoke heard a gunshot.

Michael Allmon testified that he owns a cleaning service and was cleaning the Walgreens pharmacy store right next to the Rogersville Wal-Mart. Sometime between 8:00 and 8:30 p.m., he was outside smoking a cigarette when he saw a dark-colored car, with its light off, go up on the hill and into the abandoned car wash. He recalled that he later heard a pop but did not know what the noise was.

Jordan Hinkle, who was sixteen years old at the time of the trial, testified that he and his brother Josh were affiliated with a gang called the Bloods. He said that, on the night of the shooting, he went to the Wal-Mart parking lot, where he saw the Defendant and Mr. Goins. He said that he saw them leave, then come back to the parking lot, and then leave again. After he saw them leave the second time, he heard what he thought was a firecracker. Then, he heard tires squeal at the top of the hill and saw a black Nissan drive off.

Josh Hinkle, who was twenty years old at the time of the trial, testified that he was affiliated with a gang called the Bloods on December 9, 2008. However, he said that, since then, he had "tried to put all that stuff behind [him]." He testified that he knew both the Defendant and Mr. Goins and that he and the Defendant "have had problems since back in middle school" because they did not see eye to eye. He acknowledged that, if they saw each other at the "right time," then they "might fight," but that they never pre-arranged times to fight. Josh Hinkle said there were also problems between him and Mr. Goins because they had been involved in a car accident in Mr. Goins' step-father's vehicle a few years prior and Josh Hinkle refused to pay to repair the damaged car.

On the night of the shooting, Josh Hinkle went to the Wal–Mart parking lot and "just hung out with a lot of people." He recalled that, at the time of the shooting, he was sitting on a corral where returned shopping carts are kept. He stated, "Everybody else was standing around me, and then we heard pop, a real loud pop." He said that he then saw the victim grab his neck and collapse.

Danielle Bailey testified that she knew the victim and his mother. She recalled that, when she went shopping at Wal-Mart on December 9, 2008, she saw the victim in the parking lot as she was leaving and pulled over to talk with him. She said that they talked for a little while and then they decided to go hang out together. Ms. Bailey testified, "I was sitting in my car and he was about maybe three foot [sic] away from the driver's fender and I was, like, let's go, and he was telling everybody bye, and that's when it happened." She described that she heard a "pop" and then saw that the victim was bleeding.

Amy Snapp testified that she used to be a "queen" in a gang called the Black Gangster Disciple, which is a "cousin" to the Crips. Ms. Snapp said that she knew the Defendant and Mr. Goins were affiliated with the Crips and that she "took them under [her] wing." She was at Wal-Mart on the night of December 9, 2008, and was in the process of leaving the parking lot and going to get something to eat, when she "heard a pow, like a firecracker." She did not know that the victim had been shot, and she and her cousin continued to drive toward the restaurant. She then described, "As we was at the red light, I seen a black car jump over – It was coming from the car wash and the Exxon." She said that the black car was the same car in which she had seen the Defendant and Mr. Goins earlier that evening.

Through testimony of an employee who worked at a gas station near the crime scene, the State introduced surveillance pictures showing the Defendant and Mr. Goins at the gas station at 5:31 p.m. The pictures show that the men were in a black Nissan Maxima.

Dr. William McCormick performed an autopsy on the victim and testified that the victim "was shot one time at a distance with a bullet entering the junction in the back of the head and the upper neck, just to the left of midline. The bullet angled from above downward and ended up lodged on the inside of the large jaw, the mandible." Dr. McCormick also stated that, when the bullet traveled through the victim's neck, it caused bleeding. He said that he found that the victim both inhaled and swallowed blood and that the victim's death, caused by his aspiration of blood, "would have been rapid but not instantaneous."

Special Agent Scotty Ferguson from the Tennessee Bureau of Investigation testified that he reported to the crime scene the night of the shooting, but he arrived after the victim was taken to the hospital. Although he could not be sure where the victim was standing when he was shot, based on witness statements, he estimated that the victim was standing approximately

ninety-two feet from the edge of the concrete at the old car wash. He also said that the victim was standing approximately twenty-two feet from where Josh Hinkle was sitting on the shopping cart corral.

Special Agent Ferguson recalled that the Defendant was arrested on December 13, 2008. After his arrest, the Defendant gave consent for the police to search the black Nissan Maxima, which was found at his father's girlfriend's residence. Special Agent Ferguson testified that a .22 caliber shell casing was found on the floorboard on the front passenger's side of the Nissan Maxima.

On December 13, 2008, the Defendant signed a rights waiver and gave a statement to Special Agent Ferguson. In pertinent part, the Defendant's statement provided as follows:

> Josh Hinkle and Travis [Goins] used to be good friends. Josh wrecked Travis's car (it had been Travis's dad's car). Josh never paid Travis back for the car.
>
> This has been going on since 2003. I was trying to get Josh for Travis. Josh always runs from Travis and me.
>
> Josh has got some of his little buddies to talk trash and stuff about me and Travis. They do it on the phone and on My Space. Josh and his little boys think they are Bloods. Bloods are black.
>
> . . . .
>
> They send messages on My Space about beating me up. Josh calls on my cell phone and says he wants to fight but he never shows up.
>
> I had went to Josh's house but learned he lives with his Grandmother. I learned it was his Grandmother's place and she is elderly so I didn't want to disrespect her.
>
> Jordan Hinkle and some of his black buddies said on My Space that they were going to come and kick in my Grandmother's door. This was around February. . . .

-6-

I saw Jordan Tuesday afternoon at school. He was throwing up gang signs (at the buses). It was when they were getting out of school at about 3:00 p.m. I was driving the black Nissan Maxima. I got it since I was getting ready to have a kid. I got out and did it back to him. Travis and Adam (red hair) were with me and saw Jordan throwing the signs.

Me and Travis rode around some that day. We took showers (Dad's house). I live with my Granny. We went to Travis's girl's house (Jasmine) but she was sick. We rode around town and talked to some people. We went to Wal-Mart. We were sitting w[h]ere everyone was. Travis was talking to Jim Ward and I was talking to Shane Harmon/Harlan (just got out of Army). Jordan and Josh pulled up in their Brat. Jordan jumped out and started talking to all the Blood dudes. Jordan said I seen Eugene Brewer at school but then he seen me sitting there so then he started whispering to his buddies. Jordan came over to the car and talked to Travis. Jordan said that he didn't have a problem with Travis but just with me. I told him that I never had a problem with him until he threatened to kick my Grandmother's door. He then left and went back to his buddies.

We then went to Big Lots to see if anyone was there. We then went to Jasmine's because Travis was worried someone else might be there. Then we came back to Wal-Mart. We went to same spot and I talked to Shane again. Everyone was just talking and staring and stuff. More of Josh and Jordan's friends (Bloods) started coming in and you know something was up. I can feel the animosity. I have seen Josh and Jordan with guns before. I did not see any guns that night but they have threatened to shoot me.

I then talked to Danny Bledsoe – him and Candy were getting ready to go into Wal-Mart. I told Danny that they were getting pretty deep and I thought something was going to happen. . . .

I thought something was going to happen. They kept getting deeper and deeper. I asked Danny if he would help and he said he would but he did not believe anything was going to happen.

Danny went on in the store.

Me and Travis just sat there and watch what was going on. . . . They were yelling at us but never came toward us. We went to Dad's to get the [ .]22 rifle. The gun was in my bedroom. It was short and had a scope. It held 6 rounds. It was loaded. I worry about them kicking my doors in. Beck and Rhonda were there[.] I don't think they saw me get the gun. Travis went in to charge his phone. I don't know if Travis saw me or not. I put the gun beside the seat. The gun was between the driver's seat and console. Rhonda came out while I was sitting in the car. Rhonda said Brandon West was put in jail. She said that Travis was charging his phone and would be out in a minute.

We went back to Wal-Mart. I was driving. We parked in front of the gas part. We were parked about 151 minutes. We moved up some in the parking lot. We drove around toward Wal-Mart and then to another parking spot on the other side of them. I saw Brandon West drive around and go out at the red light. They (Hinkle's [sic] and Bloods) were hollering. There were more coming in. They were yelling at us and making hand gestures.

We sat there a little longer. I figured they would eventually come to the car. They were driving around our car some. We left the parking lot. We went up to the car wash. We sat there. We just were off 66.

I got into the passenger seat. Travis drove to where we could see the people. He pulled too close. I told him to pull back. Everyone knew we were up there. I put the gun out of the window and I asked Travis where Josh was sitting. He said he was sitting on the cart thing. Travis asked me not to kill him so I aimed low (chest area). I pulled the trigger. I assume Jackson walked in front of Josh. I don't know Jackson. We drove off. We went to Kingsport on the back roads. We went to some apartment parking lot.

Travis began getting scared. He was excited when I first shot. We had about hit a police car on 11 W (it had its blue lights). After that Travis freaked out whenever a car passed. He said we can't go back to Rogersville, he would lose his job and not see his daughter. At the parking lot Travis was getting calls that

-8-

people were threatening his family. He kept saying he was going to turn himself in.

I spent the night in the car. I have only slept one night since it happened.

I tried to call Kayla.

The car is at Rhonda's trailer in Bulls Gap. She does not know it is there. I threw the gun in a dumpster in Kingsport. I think it was Model City Apt. we were at. I put the gun in one of the large dumpsters that a truck picks up. The dumpster was right there at the apartments we were at. The dumpster was to the right.

The dude that died, I did not mean for him to die. I would tell him I was sorry. There is nothing I can say to [sic] dude, he is gone.

I kept the gun was [sic] in my room. Dad had the gun. Mom had took it but Mom brought it back.

I was just wanting to see Kayla. We were in Dad's van.

I gave this statement freely and voluntarily. No threats or promises have been made to me. I gave this statement because I wanted to tell the truth and give my side of the story.

When Special Agent Ferguson was asked about the Defendant's demeanor while he was giving the statement, he replied, "I wouldn't say he was overly upset and not real, real nervous. He was actually very matter of factly."

Assistant Chief James Hammonds, from the Rogersville Police Department, testified that, on December 15, 2008, after the Defendant's arraignment, he transported the Defendant from Rogersville to the Grainger County Jail. He stated that, during the trip, the Defendant said, "[T]his is just a bad dream and I am waiting to wake up[.] I've really messed up."

Shelley Betts, employed by the Tennessee Bureau of Investigation and assigned to the firearms identification unit, testified that she examined a fired cartridge case and described that "[i]t was a Remington manufactured brass

cartridge case, and it was .22 long rifle caliber." Ms. Betts also examined the bullet that struck the victim and said that "it was consistent in all regards to Remington bullets."

Investigator James Quick, from the Knoxville Police Department Intelligence/Gang Unit, testified that he identifies gang members by utilizing a point system that "break[s] down gang identifiers as well as criminal activity." He explained that, if a person had ten points or more, it would verify that they were a gang member. Investigator Quick testified that he reviewed literature, pictures, and posters found in a search of the Defendant's bedroom and assigned twenty-three points to the Defendant.

The Defendant, twenty-one years old at the time of the trial, testified that he became fascinated with the Crips when he was ten or eleven years old and was a member of the gang. He described Josh and Jordan Hinkle as "wannabe Bloods." However, he explained that their different gang affiliations did not cause his dislike of the Hinkles. The Defendant said that "the feud started over the car of Travis's deceased father. Hinkle had wrecked it and said he would pay for it, the damage, and never did."

On the night of the shooting, the Defendant said that, when he was in the Wal-Mart parking lot, he felt "the tension was building up." He elaborated, "I figured something was going to happen because it was . . . the first time that me and Hinkle had actually been that close to one another without him running away." Therefore, he went to his father's house and got a .22 caliber rifle. The Defendant claimed that he got it because he knew the Hinkles "tend to carry guns and stuff."

The Defendant recalled that he and Mr. Goins returned to the parking lot and observed people "standing around there and talking and stuff and making hand gestures or whatever towards" their car. He explained that the hand gestures he saw were used to indicate "what are you looking at, or something like, do you have a problem?"

Then, the two men went up to the car wash. When asked why, the Defendant replied, "I wanted to observe the crowd of people, I guess at a better angle." The Defendant described what happened next as follows:

> [W]e pulled up on the backside of the car wash and we sat there
> for a minute. And I told Travis to get in the driver's seat, so I
> got out and walked around the car, and he walked around the

-10-

front of the car and I walked around the back. And then when I got in the car I took the gun out and put it on my side, on the passenger side. And then when he got, you know, in the driver's seat he pulled through the back bay and went around to the front until we could see the parking lot. And he pulled up more towards the parking lot than I wanted him to so I asked him to pull back. And then he pulled more to the building, and I put the gun out the window. And I looked through the scope and it was dark so I couldn't see real well at the time. I mean, I could see where the light in the parking lot was on the people standing there. And I seen Hinkle sitting on the car—return cart rack, and I made sure, I asked Travis, I said, Is Hinkle setting on the cart rack? And he told that, yes, that's where he's sitting.

And then, you know, I looked through the scope again or whatever, and Travis asked me not to kill no one. And I had no intentions of killing anyone, anyways. I aimed low like below the hip—between the hip and knee area because he was sitting on the cart rack. And I pulled the trigger.

The Defendant said that they then drove away. He claimed that he did not know if anyone had been struck by the bullet. However, when asked why he left, he replied, "I fired a shot into a—a public area."

The Defendant explained that the catalyst that brought about the shooting was a threat that the Hinkles had made to kick in his grandmother's door and shoot at her house. He testified, "I was just tired of the threats and, you know, I had started dwelling on the situation so I decided, you know, I figured I would scare the dude." Although the Defendant did not agree that he planned the shooting, he acknowledged that he "thought about it."

The Defendant maintained that, when he fired the rifle, he "aimed to wound and scare" Josh Hinkle. However, when asked whether he knew he shot somebody when he left the scene, he replied, "Well, yes. I aimed at the dude to wound and scare him. So I figured it would hit him. I figured somebody would have been shot."

Regarding the notation in his statement that he aimed for Josh Hinkle's chest area, the Defendant said that Special Agent Ferguson must have misunderstood him. He recalled his conversation with Special Agent Ferguson

as follows: "[H]e said, What do you mean low? He said, [c]hest area? And I said, no, chest would be high."

Regarding his assumption that the victim must have walked in front of Josh Hinkle at the moment he fired the rifle, the Defendant explained, "It was the only thing I could figure out because at the time I didn't – nobody was in front of him. I mean, they [sic] might have been people off to the right of him or the left of him. There was nobody directly in front of him, though." The Defendant said that he did not know the victim and that, as far as he knew, the victim "had nothing to do with any gang activity."

State v. Ronald Eugene Brewer, Jr., No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *1-8 (Tenn. Crim. App. July 14, 2011), perm. app. denied (Tenn. Sept. 21, 2011).

The Petitioner subsequently filed a petition for post-conviction relief, arguing that he was denied due process at trial. He also alleged multiple instances of ineffective assistance of counsel at trial ("trial counsel"). At the post-conviction hearing, the Petitioner testified that trial counsel represented him from the initiation of proceedings through the direct appeal of the present case. He agreed that, "[f]or the most part," trial counsel did everything the Petitioner asked him to do. However, there were "[s]ome things" that trial counsel did in his representation which the Petitioner did not want, such as "[a]gree to the gang-related stuff." The Petitioner explained that the State used as its motive that the case was gang-related and that trial counsel told the Petitioner that it was in his best interest to agree to the information. According to the Petitioner, trial counsel told him that, if he did not agree to the fact that the case was gang-related, the State would introduce evidence to further incriminate him, such as his social networking website and pictures. However, the State introduced some of this evidence anyway.

As far as trial counsel's communication with the Petitioner, the Petitioner testified, "He came and seen [sic] me very regularly." Trial counsel explained to the Petitioner the Petitioner's charges.

The Petitioner believed that his statement should not have been admitted at trial because he was intoxicated at the time that he made the statement. When the Petitioner discussed the issue of intoxication with trial counsel, trial counsel told the Petitioner that he would use the defense of intoxication at sentencing. The Petitioner further stated that he was intoxicated at the time that this crime was committed.

The Petitioner testified that he learned that a prosecutor for the State in his case had a "sex scandal" with one of the witnesses at his trial – Samantha Allen. The Petitioner introduced a death certificate of Samantha Allen to establish that she could not be called as

a witness at the post-conviction proceedings. According to the Petitioner, the prosecutor and Allen "had sex for agreements to testify and whatever he needed her to do." The Petitioner believed that the State made an offer of leniency to Allen in exchange for her testimony. The Petitioner introduced Allen's sworn statement made to the State in a later, unrelated proceeding.

The Petitioner was unable to answer several questions regarding allegations made in his petition, and he explained that another inmate drafted the petition for him and that he simply signed it. He agreed, however, that his post-conviction counsel reviewed the petition with him prior to the post-conviction hearing.

On cross-examination, the Petitioner acknowledged that, prior to trial, trial counsel visited him frequently, reviewed the evidence with him, filed various motions on his behalf, and had an investigator meet with him on several occasions. The Petitioner also acknowledged that trial counsel attempted by motion to exclude the gang-related testimony from the trial but that the trial court allowed admission of "certain" evidence.

The Petitioner confirmed that trial counsel conveyed to him a plea offer from the State and advised the Petitioner to accept the offer but that the Petitioner insisted upon going to trial. Additionally, the Petitioner agreed that trial counsel reviewed with him the consequences of the Petitioner's choosing to testify but that the Petitioner decided to testify anyway. The Petitioner could not name any witnesses that trial counsel did not call to testify who should have testified. When asked whether he wished that trial counsel had called more witnesses at sentencing for mitigation, the Petitioner stated, "I don't really reckon it would have mattered."

The following colloquy occurred between the State and the Petitioner:

Q: In fact, you didn't have any problems with [trial counsel], did you?

A: No. I just – I had to use the counsel thing to file this appeal.

. . . .

Q: So, there's really, sir, if I understand it right, there's no – [trial counsel] was not ineffective in anything, you're just using that to get the Court to reconsider it; is that correct?

A: Yes.

Q: So you don't know of anything that [trial counsel] didn't do or did do that should have been different, do you, sir?

A: No.

The Petitioner agreed that he had no personal knowledge regarding the prosecutor's conduct with Allen to substantiate his allegation. He also acknowledged that he had no personal knowledge as to whether a deal or "promised leniency" actually occurred.

Trial counsel testified that he was appointed to represent the Petitioner at trial. Trial counsel sought to suppress any evidence pertaining to gang affiliation, but the trial court allowed it, with the exception of "some of the more graphic prejudicial to the extreme pictures." Regarding his preparation for the case, trial counsel stated, "We went to every scene, we went to all the places where [the Petitioner] had been, we looked at every piece of evidence offered to us, we talked to everyone I knew to talk to, and I think that we saw everything and did all that we could."

Concerning trial counsel's strategy at trial, trial counsel stated that he hoped to convince the jury to convict the Petitioner for a lesser-included offense. Trial counsel recalled that he attempted to suppress statements made by the Petitioner to the Tennessee Bureau of Investigation. However, his suppression attempts were not successful.

Regarding the potential intoxication defense, trial counsel testified,

I – we did talk about intoxication and, in fact, to me, it was more potentially a defense in trying to attack his statement, and that didn't work. Voluntary intoxication is not the greatest defense and I told him that. And when your actions indicate perhaps that you know you've done something wrong by, for example, running, it makes that defense rather difficult to carry, and we discussed that, yes.

When asked whether trial counsel ever addressed the Defendant's competency or mental capacity, trial counsel stated that he consulted with a physician who did "extensive testing." According to trial counsel, this physician "had nothing to offer that would be of benefit in this trial." As far as calling this physician as a witness for the defense at sentencing, trial counsel stated, "[H]is testimony, if cross-examined by the State, could have been more damaging than good on issues ranging from [the Petitioner's] future activities and issues such as remorse."

At the conclusion of the hearing, the post-conviction court took the matter under advisement and issued a written order denying relief on June 19, 2013. The Petitioner timely appealed.

## Analysis

Relief pursuant to a post-conviction proceeding is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

### *Brady Issue*

The Petitioner first argues that "Samantha Allen was granted an offer of future leniency for her cooperation with the State's prosecution of the Petitioner." Accordingly, the Petitioner contends that he was denied due process because the State failed to disclose this "offer" to the Petitioner prior to trial.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This doctrine also applies to "the statements of a prosecution witness that are material and favorable to the accused." State v. Spurlock, 874 S.W.2d 602, 616 (Tenn. Crim. App. 1993) (citations omitted). "It is irrelevant that the information contained in the statements can only be used to impeach the witness." Id. at 617 (citing United States v. Bagley, 473 U.S. 667 (1985)) (other citations omitted). In Spurlock, this Court stated,

> It is a fundamental principle of law that an accused has the right to cross-examine prosecution witnesses to impeach the credibility or establish the motive or prejudice of the witness. This includes the right to cross-examine

-15-

a prosecution witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness.

Id. (citations omitted).

In this case, the post-conviction court stated in its order denying relief,

Samantha Allen was a witness and interviewed by [the prosecutor for the State]. Petitioner went to trial and was convicted on February 18, 2010. Petitioner's attorney introduced a sealed T.B.I. sworn statement of Samantha Allen as collective Exhibit #4. On July 4 or 5, 2010, approximately five months after the trial, Samantha Allen was arrested on drug charges. Ms. Allen spent eight days in jail and then she and her mother went to see [the prosecutor for the State]. Ms. Allen's statement says: "I had been interviewed by [the prosecutor for the State] in the past on a murder case and he told me then if I needed anything to call him." Petitioner's attorney argues that [the prosecutor's] statement "if I needed anything to call him" was an offer of leniency to testify against Petitioner. [The prosecutor] was subsequently fired as an Assistant District Attorney and disbarred to practice law.

The Court finds that [the prosecutor's] alleged statement was not an offer of leniency because Ms. Allen was not under arrest until five months after the trial. [The prosecutor's] statement does not suggest a quid pro quo. There was no evidence that [the prosecutor] propositioned Ms. Allen until the middle of July, 2010 which was five months after the trial. . . .

The Court finds that . . . Petitioner failed to carry his burden of proof by clear and convincing evidence.

From a review of the record, including Allen's sworn statement, we conclude that the evidence does not preponderate against the post-conviction court's findings. The Petitioner's trial was in February 2010. According to Allen's statement, she was not arrested until July 2010. In her statement, Allen stated that, in preparation for the Petitioner's case, the prosecutor had "told [her] then if [she] needed anything to call him." After she was arrested in July 2010, she met with the prosecutor, and, eventually, the prosecutor propositioned her for sexual favors in exchange for leniency from the State.

We agree with the post-conviction court that the prosecutor's statement "if I needed anything to call him" was not an offer of leniency. This Court previously has determined that telling a witness that he could make "friends" at the District Attorney's office by testifying truthfully was "simply too vague to be an 'offer' of favorable treatment." Asata Lowe v.

-16-

State, No. E2006-02028-CCA-MR3-PC, 2008 WL 631169, at *26 (Tenn. Crim. App. Mar. 10, 2008), perm. app. denied (Tenn. Aug. 25, 2008). We similarly determine that the prosecutor's statement in this case was too ambiguous to be considered an offer of leniency. Moreover, we discern from the rest of Allen's statement that the prosecutor's "offer" actually came later, when he propositioned Allen for sexual favors. Therefore, the State's failure to disclose this information to the Petitioner did not deprive the Petitioner of his due process rights under Brady. Accordingly, the Petitioner is entitled to no relief on this issue.

### *Ineffective Assistance of Counsel*

The Petitioner argues that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[1] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal

_____

[1] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The Petitioner asserts that trial counsel was ineffective in failing to present an intoxication defense at trial, agreeing at trial to the State's theory of the Petitioner's gang involvement, and failing to present a defense at sentencing.

The post-conviction court stated in its order denying relief,

The Court finds that [trial counsel] counseled with Petitioner, investigated the case with the help of his investigators, interviewed all witnesses, inspected all evidence, explored all defenses, filed the appropriate motions and made reasonable tactical decisions throughout petitioner's trial. . . . [T]he Court

-18-

finds that Petitioner received effective assistance of counsel by his attorney, [trial counsel].

The record does not preponderate against the post-conviction court's findings. At the post-conviction hearing, trial counsel testified regarding the potential intoxication defense,

> I – we did talk about intoxication and, in fact, to me, it was more potentially a defense in trying to attack his statement, and that didn't work. Voluntary intoxication is not the greatest defense and I told him that. And when your actions indicate perhaps that you know you've done something wrong by, for example, running, it makes that defense rather difficult to carry, and we discussed that, yes.

The Petitioner, in his testimony at the post-conviction hearing, acknowledged that trial counsel attempted by motion to exclude the gang-related testimony from the trial but that the trial court allowed admission of "certain" evidence. When asked whether he wished that trial counsel had called more witnesses at sentencing for mitigation, the Petitioner stated, "I don't really reckon it would have mattered." Moreover, the Petitioner did not identify any additional potential witnesses. As far as calling a consulted physician as a witness for the defense at sentencing, trial counsel testified, "[H]is testimony, if cross-examined by the State, could have been more damaging than good on issues ranging from [the Petitioner's] future activities and issues such as remorse."

Moreover, the Petitioner was unable to answer several questions regarding allegations made in his petition, and he explained that another inmate drafted the petition for him and that he simply signed it. The following colloquy occurred between the State and the Petitioner:

> Q: In fact, you didn't have any problems with [trial counsel], did you?
>
> A: No. I just – I had to use the counsel thing to file this appeal.
>
> . . . .
>
> Q: So, there's really, sir, if I understand it right, there's no – [trial counsel] was not ineffective in anything, you're just using that to get the Court to reconsider it; is that correct?
>
> A: Yes.

Q: So you don't know of anything that [trial counsel] didn't do or did do that should have been different, do you, sir?

A: No.

We agree with the post-conviction court that the Petitioner failed to establish that trial counsel was deficient in his representation of the Petitioner. Thus, we need not address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner has failed to establish ineffective assistance of counsel, and he is entitled to no relief on this issue.

## CONCLUSION

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE